IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

KELLY BURKE, *et al.*,

Plaintiffs,

v.

TYLER GARCIA, *et al.*,

Defendants.

2:25-CV-078-Z-BR

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Tyler Garcia's Motion for Summary Judgment on the Defense of Qualified Immunity ("Motion"), filed November 20, 2025. ECF No. 33. Plaintiffs responded on January 6, 2026. ECF No. 42. Defendant Garcia replied on January 20, 2026. ECF No. 46. For the following reasons, the Court finds that Garcia is entitled to qualified immunity and therefore **GRANTS** his Motion. Plaintiffs' claims against Garcia are **DISMISSED**; their claim against Lipscomb County remains.

**BACKGROUND**

**I. Procedural History**

Plaintiff Kelly Burke brought this action on behalf of her deceased husband, Rustin Burke. She is joined by Plaintiffs Rick and Shelley Burke, Rustin Burke's parents. Plaintiffs are suing Lipscomb County Sheriff's Deputy Tyler Garcia and Lipscomb County, Texas "for the excessive, unnecessary, and deadly force Deputy Garcia inflicted on Rustin Burke and the County's practices that were the moving force of Deputy Garcia's use of excessive force." ECF No. 53 at 1. Plaintiffs bring two causes of action: (1) an excessive-force claim under 42 U.S.C. Section 1983 against Deputy Garcia only; and (2) a *Monell* claim against Lipscomb County only. *Id.* at 8–9. Plaintiffs also seek punitive damages from Deputy Garcia due to his

allegedly "extreme, outrageous, and unjustifiable conduct that led to the death of Mr. Burke." *Id.* at 8.[1]

In support of his Motion for Summary Judgment on the Defense of Qualified Immunity, Deputy Garcia submitted a 116-page appendix of summary judgment evidence. ECF No. 35. The appendix contains (1) authenticated photographs and videotapes, including footage from the body-worn cameras of Deputy Garcia and Chief Deputy Jason Lantz, (2) three videos from the Follett Food Market's interior and exterior surveillance cameras, and (3) interviews with witnesses and other individuals. Defendant Garcia manually submitted these videos to the Court in the form of two flash drives. ECF Nos. 36, 37.

## II. Summary Judgment Evidence

The competent summary judgment evidence shows that shortly after 7:00 p.m. on August 26, 2024, the Lipscomb County Sheriff's Office received a 911 call from an individual later identified as John Harvey. *See* ECF No. 34 at 10. Mr. Harvey "informed the dispatcher of an ongoing emergency at the Follett Food Market, a local grocery store in the city of Follett, Texas." *Id.* Mr. Harvey said, "I don't know what's going on," but he relayed that "there's an emergency at the Follett Food Market" and that the situation appeared "very urgent." Ex. B (911 Audio Recording). He said, "my wife is over at the front door [of the Market] and told me

---

[1] These causes of action are found in Plaintiffs' Amended Complaint, filed December 30, 2025. ECF No. 53. The Amended Complaint adds Lipscomb County as a co-defendant and brings the *Monell* claim against the County only; Plaintiffs' Original Complaint named only Defendant Garcia. ECF No. 1. Because the Amended Complaint is substantively identical to the Original Complaint as to the claim against Defendant Garcia, the Court may rule on the Motion based on the Amended Complaint. *See, e.g., Raskin on behalf of JD v. Dall. Indep. Sch. Dist.*, 69 F.4th 280, 282 n.1 (5th Cir. 2023) (noting that "the district court acted within its discretion by ruling on the pending motion" where the plaintiff amended her complaint while a dispositive motion remained pending); *Martin v. City of L.V.*, No. 25-50216, 2025 WL 3299235, at *1 n.2 (5th Cir. Nov. 26, 2025) ("The district court explained that because the allegations against these defendants remained the same between the original complaint and the amended complaint, it exercised its discretion to apply the motion to dismiss to the amended complaint."). Plaintiffs stated as much in their motion to amend their Original Complaint: "As to Defendant Garcia, Plaintiffs' amended complaint makes no substantive changes to the claims alleged against him and thus should have no effect on his currently pending motion for summary judgment." ECF No. 41 at 5 n.1 (citation modified).

to just call 911." *Id.* In response to a question from the 911 dispatcher, Mr. Harvey repeated that while he wasn't sure what was happening, he did know that "there's an off-road vehicle that's parked really right up at the doors." *Id.*

That vehicle belonged to Rustin Burke. Follett Food Market's exterior surveillance camera shows Mr. Burke driving his vehicle toward the store at approximately 7:09 p.m. *See* Ex. C 01:30–41. After stopping outside the store for a few seconds, Mr. Burke drove the vehicle into the store's front doors. *Id.* at 01:51. The first time the vehicle made contact, the glass doors cracked but didn't budge. *See* Ex. E 03:51. Burke then rammed the vehicle into the doors a second and third time. The third time was the hardest collision and caused the door to fall inwards off its hinges:




*Id.* at 04:19. Burke then backed the off-road vehicle out of the store, exited the vehicle, and entered the store on foot. He proceeded to burglarize the store, exiting and reentering several times while filling up his vehicle with soda, tea, chips, various other snacks, and cigarettes. *See* ECF No. 35 at 37. Kendra Harvey, John Harvey's wife, called 911 shortly thereafter.

Defendant Tyler Garcia happened to "call[] the same [911] dispatch for an unrelated reason" at around the same time as the Harveys. ECF No. 34 at 10. He was new to the Lipscomb County Sheriff's Department, "having graduated from the police academy on August 2, 2024, and completing his first day of work on August 12, 2024." *Id.* At the time, he was in "phase 2" of the Department's training program, "which meant that he was given guidance to not respond to any law enforcement calls where he would require backup." *Id.* He "did not have pepper spray on his person at the time of the incident," nor did he have a taser, baton, or other non-lethal weapon. *Id.* at 10–11 (noting that this was "because he had not yet been trained on the use of a taser, and his baton was on backorder"). Garcia nonetheless "told the dispatcher that he would be driving by the Follett Food Market on his way home and volunteered to stop by the store," even though he "was nearing the end of his shift." *Id.* at 11. "At the time, Deputy Garcia believed that the unknown emergency was likely medical in nature, because medical emergency calls frequently originated at the store." *Id.* (citing Ex. M (Voluntary Sworn Statement of Deputy Tyler Garcia)). Garcia arrived at the store at approximately 7:14 p.m., roughly four minutes after Burke first began ramming his vehicle into the store's doors. *See* Ex. C 06:20 (showing Garcia's Lipscomb County Sheriff's Department truck entering view at 7:14:08 p.m.).

The first thing Garcia saw was Burke's off-road vehicle parked directly outside the store's doors. ECF No. 34 at 12. "The store's double glass front doors were shattered and lying inside the entryway, having been torn completely from the doorframe." *Id.* The rear trunk of the vehicle, which was open and facing outwards toward the street, was filled with various loose items, including hardware tools, a metal pipe, and a sledgehammer:



ECF No. 35 at 39.

About ten seconds after he arrived, Garcia made contact with Mrs. Harvey, "who was standing towards the right trunk area of the UTV." ECF No. 34 at 13. Burke had just come back out of the store while Garcia and Mrs. Harvey briefly exchanged words, but Burke remained on the opposite side of his vehicle, obscured from Garcia's view. Ex. C 06:34. "Mrs. Harvey informed Deputy Garcia that a male, later identified as Rustin Burke, had repeatedly rammed the front doors of the Follett Food Market with his UTV until they were broken down, at which point Burke began stealing items from the store and placing them inside his UTV." ECF No. 34 at 13. Garcia continued speaking with Mrs. Harvey while Burke placed several more stolen items inside his off-road vehicle's cab. Ex. C 06:33–40. The Follett Food Market video shows Burke pausing for nearly thirty seconds while Garcia walks toward Mrs. Harvey, his feet on the ground but his upper body and hands inside his vehicle's half-open driver's side door. Ex. C 06:43. It's unclear whether Garcia could see Burke at all at this point. He certainly could not see what Burke was doing inside the off-road vehicle.

This is where the parties' accounts begin to diverge. Despite their conflicting versions of events, the Court finds there is no genuine dispute as to any of the following material facts.

Barely ten seconds after Deputy Garcia finished walking towards Mrs. Harvey, who was standing about five feet away from the vehicle's trunk, Burke exited and shut the door of his off-road vehicle. Ex. C 06:50. Burke then rushed around the rear of the vehicle toward Garcia and Mrs. Harvey. *Id.* at 06:50–52. All the while, Garcia was standing directly next to Mrs. Harvey and had both of his hands lifted up in a non-threatening "surrender"-like gesture. Even so, Burke walked directly at Deputy Garcia with his right hand extended toward Garcia. *Id.* at 06:52–54. Burke then lunged at Garcia, grabbing at Garcia's outstretched hands:




*Id.* at 06:54.

All of this happened in the span of four seconds. From Garcia's perspective, he had responded to a medical emergency. Now he was physically confronting an aggressive individual he knew had a history of drug use. *See* ECF No. 34 at 15 n.3 ("I recognized the

male and knew his last name was Burke but did not know his first name and knew he had prior issues with illegal drug use." (citing Ex. M (Voluntary Sworn Statement of Deputy Tyler Garcia))). Garcia did not have an opportunity to speak with Burke or search him for concealed weapons before Burke started the confrontation. The pair were also just a few feet away from the off-road vehicle's trunk, which contained Burke's sledgehammer and other potentially dangerous items. While it is unclear whether Garcia saw these items, he was facing them, with Burke standing between him and the vehicle's trunk.

In the few seconds before Burke physically engaged with him, "Deputy Garcia observed that Burke had wide, bloodshot eyes, an unkempt appearance, and that he appeared to be smirking." ECF No. 34 at 17 (citing Ex. M). "Based on Burke's physical appearance, his knowledge of Burke's prior illegal drug abuse, and Burke's aggressive demeanor, Deputy Garcia reasonably believed that Burke was under the influence of drugs." *Id.* Garcia commanded Burke to "show him his hands and to keep back, both of which Burke ignored." *Id.* Mrs. Harvey heard this. *See id.* ("Mrs. Harvey heard Deputy Garcia verbally instruct Burke to 'show me your hands, show me your hands' as Burke began to walk around the back of the UTV."). So did Mr. Harvey, who was observing the situation from a greater distance. *See id.* ("Mr. Harvey heard Deputy Garcia instruct Burke to put his hands up before Burke moved his body into a 'lunging' position, which Mr. Harvey described as a position one would take when preparing to wrestle another person.").

With Burke walking directly toward him, Garcia tried to back up. Ex. C at 06:54–56. Burke quickly closed the gap. *Id.* at 06:56–58. Garcia tried to keep Burke at a distance by holding his left arm outstretched while continuing to step backwards. This too failed and Burke again closed the distance between himself and Garcia. *Id.* at 06:58–59. Then Burke lashed out at Garcia once more, grabbing for the radio handset attached to the top left of Garcia' protective vest. At the same time, Burke appears to also reach out his left hand

toward Garcia's right hip, where Garcia's firearm was holstered. Burke's erratic movements dislodged the radio from Garcia's vest, leaving it swinging above the ground between them. *Id.* at 06:59–07:01. Burke then dove toward the radio in an attempt to grab it.

After Burke failed to get hold of Garcia's radio, he continued advancing toward Deputy Garcia, trying a second time to grab Garcia's radio and seemingly also Garcia's left forearm. Ex. C. 07:01–02. This time he succeeded. The Follett Food Market external surveillance footage shows Burke grasping Garcia's loose radio—still attached to Garcia's body by a plastic cord—before securing the cord with both hands and leaning back in a tug-of-war-type posture. *Id.* at 07:01. The two then begin to revolve around the ground between them in a slow semicircle.

With a violent and seemingly intoxicated individual mere feet away from him and with a radio attached to his body now in that individual's hands, Garcia drew his sidearm. Ex. C 07:01. While the store's surveillance camera does not record audio, Garcia avers that he repeatedly instructed Burke to "get back," "stop right now," and "stop." ECF No. 34 at 20. Despite these warnings, Burke maintained his grip on Deputy Garcia's radio cord, continually pulling further up the cord in an attempt to force Garcia closer to him. Ex. C. 7:01–06; *see also* ECF No. 34 at 20–21 ("Burke then began pulling Deputy Garcia's radio cord in a 'hand over hand fashion,' allowing him to once again begin closing the distance between Deputy Garcia and himself.").

Garcia fired twice. Both bullets struck Burke in the torso. ECF No. 34 at 21. Burke later died on the way to the hospital.[2]

---

[2] While not directly relevant to whether Deputy Garcia's use of force was reasonable, the summary judgment evidence shows that Burke continued to resist arrest after he was shot. Garcia's body-worn camera shows Burke struggling with Garcia and Raylynn Callaway, a volunteer firefighter, for nearly ten minutes before a third deputy arrived and the three men finally handcuffed him. Ex. A-2 00:00–08:34. Garcia tells Burke multiple times he is trying to get Burke medical treatment, but Burke's compliance is required before he can do so. *Id.* at 00:39–42 ("I got help coming for you, stay down.");

**LEGAL STANDARD**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if its existence or non-existence "might affect the outcome of the suit under the governing law," and a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Brown v. City of Hou., Tex.*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." (citing *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003))).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)). While the moving party is not required to negate each element of the nonmoving party's case, it can meet its burden by demonstrating the "absence of facts supporting the elements" of the nonmoving party's causes of action. *Little v. Liquid Air Corp.*,

---

*id.* at 02:59–03:03 ("Stay down. We have help coming for you, okay?"); *id.* at 04:50–56 ("Do not fight me. Give me your other hand. Give me your other hand. I need to get you help."). At one point, Burke seemed to get his left hand on Deputy Garcia's holstered gun. *Id.* at 05:12–16. When the officers finally handcuff Burke, who continued to resist, paramedics provided immediate medical assistance. *Id.* at 08:30–09:26. Even after being loaded into the ambulance, Burke continued to kick the paramedics who were trying to render aid. *See* ECF No. 34 at 26 ("Chief Deputy Lantz tells Burke that they are all there to help him, but Burke continue[d] to kick his legs, prompting one member of the EMS crew to shout, 'don't kick me.' One member of the EMS crew resorted to placing her knee on top of Burke's legs so he could no longer kick her." (internal citations omitted)).

37 F.3d 1069, 1076 n.16 (5th Cir. 1994) (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986)).

**ANALYSIS**

A review of the competent summary judgment evidence and the parties' briefing reveals no genuine issues of material fact that preclude summary judgment. In other words, Plaintiffs have not directed the Court to any evidence in the record that raises a genuine fact issue about whether Defendant Garcia's actions were objectively unreasonable in light of clearly established law at the time of the shooting.[3]

## I. Qualified Immunity and Excessive-Force Claims

"Qualified immunity includes two inquiries." *Morrow v. Meachum*, 917 F.3d 870 (5th Cir. 2019) (Oldham, J.). The first is "whether the officer violated a constitutional right." *Id.* "The second question is whether the 'right at issue was clearly established at the time of [the] alleged misconduct.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Courts "can decide one question or both." *Id.* (citation omitted).

A qualified immunity defense also "alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005)). Unlike typical summary judgment motions, "[o]nce an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (quoting *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017)); *see also Salazar v. Hastings*, No. 5:23-CV-054, 2025 WL 2638669, at *7 (N.D. Tex. Sept. 12, 2025) (Hendrix, J.)

---

[3] This is so even though Plaintiffs objected to six of Deputy Garcia's exhibits on evidentiary grounds. *See* ECF No. 43 at 15–19. Because the remainder of the record clearly establishes that Garcia is entitled to qualified immunity, the Court declines to consider those objections and issues this Order without relying on Defendant's objected-to exhibits.

("Defeating an invocation of qualified immunity requires that the plaintiff 'point to summary judgment evidence (1) that [the official] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was clearly established at the time.'" (quoting *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (internal marks omitted))). The plaintiff's burden is heavy: "A right is clearly established only if relevant precedent 'ha[s] placed the . . . constitutional question beyond debate.'" *Morrow*, 917 F.3d at 874 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). And the Supreme Court's cases "teem with warnings about the difficulty of placing a question beyond debate." *Id.*; *see also generally, e.g.*, *Ziglar v. Abbasi*, 582 U.S. 120 (2017); Aaron L. Nielson & Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 NOTRE DAME L. REV. 1853 (2018).

If that didn't set the bar high enough, "overcoming qualified immunity is especially difficult in excessive-force cases." *Morrow*, 917 F.3d at 876. "This 'is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.'" *Id.* (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)). And because "excessive-force claims often turn on 'split-second decisions' to use lethal force," the law must be "so clearly established that—in the blink of an eye—every reasonable officer would know it immediately." *Id.* (quoting *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 582 (5th Cir. 2009) (citation modified)).

In excessive-force cases, "[t]he qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341–43 (1986)). This means a "mistake in judgment does not cause an officer to lose his qualified immunity defense." *Salazar*, 2025 WL 2638669, at *6. "Further, that the officer

himself may have created the situation does not change the analysis. That he could have handled the situation better does not affect his entitlement to qualified immunity." *Id.* (citing *Young v. City of Killeen*, 775 F.2d 1349, 1352–53 (5th Cir. 1985)). Said differently, the "Supreme Court has repeatedly instructed lower courts 'not to define clearly established law at a high level of generality.'" *Id.*, at *7 (quoting *Kisela*, 584 U.S. at 104). Instead, the purported right must be defined narrowly and specifically rather than abstractly. And it "is the plaintiff's burden to find a case in his favor that does not define the law at a high level of generality." *Weisshaus v. Teichelman*, 637 F. Supp. 3d 434, 440 (N.D. Tex. 2022) (Kacsmaryk, J.) (quoting *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (internal marks omitted)), *aff'd*, No. 22-11099, 2024 WL 620372 (5th Cir. Feb. 14, 2024).

Lastly, in *Barnes v. Felix*, the Supreme Court refined the qualified-immunity inquiry further. 605 U.S. 73 (2025). The Court unanimously held that the law of this circuit prior to *Barnes*—the so-called "moment-of-threat" doctrine—improperly "constrict[ed] the proper inquiry into the 'totality of the circumstances.'" *Id.* at 79. Thus, after *Barnes*, courts may no longer isolate the final split-second before an officer used deadly force; they must consider the full range of circumstances that led up to that moment. *See id.* at 76 ("To assess whether an officer acted reasonably in using force, a court must consider all the relevant circumstances, including facts and events leading up to the climactic moment."). Concurring, Justices Kavanaugh, Thomas, Alito, and Barrett emphasized that officers continue to enjoy wide latitude to make reasonable but mistaken judgments:

> [T]he judiciary still must assess any resulting Fourth Amendment claim under the standard of objective reasonableness. Under this Court's precedents, that inquiry involves a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. In conducting that analysis, judges should keep in mind that it is one thing to dissect and scrutinize an officer's actions with the 20/20 vision of hindsight, in the peace of a judge's chambers.

> It is quite another to make split-second judgments on the ground, in circumstances that are tense, uncertain, and rapidly evolving. In analyzing the reasonableness of an officer's conduct at a traffic stop, particularly traffic stops where the driver has suddenly pulled away, courts must appreciate the extraordinary dangers and risks facing police officers and the community at large.

*Id.* at 89 (Kavanaugh, J., concurring) (citations and internal quotation marks omitted). So while *Barnes* may have widened the scope courts look through, they must still view events from the officer's perspective, not "with the 20/20 vision of hindsight." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

**II. Video Evidence**

Plaintiffs' first problem is that Defendant Garcia produced several authenticated video recordings of his encounter with Burke. These videos directly contradict many of Plaintiffs' claims about Burke's actions on August 26, 2024.

For example, eight separate times in their Response, Plaintiffs write that "Mr. Burke clearly seemed to be joking around and was not threatening or aggressive." ECF No. 43 at 33; *see also, e.g.*, *id.* at 9–10 ("Mr. Burke complied, walking toward the deputy at a normal walking pace, with his hands visibly empty by his sides, laughing like he and the Deputy were joking around."); *id.* at 27 ("[T]he unarmed Mr. Burke was non-threatening and non-aggressive and his demeanor was instead consistent with joking around with a deputy he recognized and trying to play with a radio.").

These characterizations are wholly inconsistent with an objective viewing of the summary judgment evidence, which depict Mr. Burke threateningly advancing toward Garcia, reaching multiple times for Garcia's radio and potentially also his gun, while ignoring repeated commands to "stop." The Court does not accept Plaintiffs' version of the facts where the summary judgment record clearly contradicts their allegations. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (Scalia, J.) ("At the summary judgment stage, facts must be viewed in

the light most favorable to the nonmoving party only if there is a '*genuine*' dispute as to those facts." (emphasis added) (quoting FED. R. CIV. P. 56(c))). A nonmovant's alleged factual dispute is not genuine where it is impossible to reconcile with clear video evidence.

**III. Garcia's Use of Force**

It is undisputed that Burke was injured by Garcia's actions. The parties agree that Garcia shot Burke and that Burke died as a result. Thus, the key inquiry is whether Garcia acted *reasonably* when he shot Burke.

He undoubtedly did. After *Barnes*, courts must consider the full range of events that led to an officer's use of force. *See* 605 U.S. at 83 ("[A] court cannot thus 'narrow' the totality-of-the-circumstances inquiry, to focus on only a single moment. It must look too, in this and all excessive-force cases, at any relevant events coming before."). Here, those events show that Deputy Garcia's use of force was reasonable under the circumstances.

*A. Garcia's Duty to Respond to the Emergency*

Start with what Garcia knew at the time the 911 dispatcher told him to respond to the Harveys' call from the Follett Food Market. "At the time, Deputy Garcia believed that the unknown emergency was likely medical in nature, because medical emergency calls frequently originated at the store." ECF No. 34 at 11. Garcia believed it was his duty to respond to this emergency, despite the fact that he remained in "phase 2" of the Lipscomb County Sheriff's Department's training period. *See* ECF No. 35 at 85 ("I can't sit in my vehicle and wait there if something is going on, sir. . . . I do have a duty to respond."). Garcia also points to Article 2A.051 of the Texas Code of Criminal Procedure, General Powers and Duties of Peace Officers, which provides:

> Each peach officer shall: (1) preserve the peace within the officer's jurisdiction using all lawful means; (2) in every case authorized by this code, interfere without a warrant to prevent or suppress crime; . . . [and] (5) when authorized by law, arrest an offender without a warrant so the offender may be taken before the proper magistrate or court and be tried[.]

TEX. CODE CRIM. PRO. ANN. art. 2A.051 (West 2025).

Plaintiffs counter that another provision "distinguishes between the myriad offenses and situations in which an officer 'may' arrest versus a violation of a protective order for which they 'shall' arrest if the offense is committed in their presence. ECF No. 43 at 23–24.

The Court need not resolve this issue for a simple reason: It was Burke who "forced" the confrontation with Garcia, not the other way around. *Cf.* ECF No. 43 at 23 ("Deputy Garcia was not duty-bound to force an interaction with Mr. Burke under Texas state law."). From Deputy Garcia's perspective, he was walking into a medical emergency. But within seconds, he was being attacked by the very person he intended to help. It was Burke who initiated the altercation with Garcia and refused to listen to Garcia's lawful orders to stand down. Garcia had no idea what awaited him at the Follett Food Market, so he could not have known that he would be met with violence from a person apparently under the influence of drugs. And once Burke began the fight and ignored Garcia's commands to behave peaceably, Garcia could not simply run the other way. In fact, *Burke himself* foreclosed this course of action by grabbing Garcia's radio cord.

In essence, Plaintiffs argue that Deputy Garcia should not have responded *at all*. Accepting that reasoning would incentivize law enforcement to ignore calls to avoid the probability of physical altercation. That is not the law—and the argument inverts the nature and purpose of law enforcement.

*B. The Reasonableness of Garcia's Use of Force*

Considering the totality of the circumstances under *Barnes*, the Court finds that Deputy Garcia reasonably used deadly force against Burke. The familiar *Graham* factors operate at prong one of the qualified immunity analysis, which asks whether the officer violated the plaintiff's constitutional rights by employing objectively unreasonable force.

Under *Graham*, "[f]actors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (citing 490 U.S. at 396). The competent summary judgment evidence establishes that each of these factors favors finding that Garcia did not use "excessive force."

Under the first factor, the "severity of the crime" depends on how one defines Burke's crime. From Garcia's perspective, he thought there was no crime at all until he arrived at the scene. But as soon as he arrived, he saw Burke's off-road vehicle sitting in front of broken glass, and Mrs. Harvey told him that Burke "had repeatedly rammed the front doors of the Follett Food Market with his UTV until they were broken down, at which point Burke began stealing items from the store and placing them inside his UTV." ECF No. 34 at 13. Thus, before Garcia arrived, he thought he was responding to a medical emergency rather than an ongoing crime. But after he arrived at the store, he was immediately informed that a *burglary* was underway. He did not know the perpetrator was Burke at that point, nor did he know whether Burke was armed. He did know, however, that someone had forcibly rammed a large off-road vehicle into a business's doors in order to burglarize it. That fact alone put him on notice that a dangerous and potentially armed individual was in the vicinity.

Then, just seconds later, Garcia found himself face-to-face with Burke, retreating while Burke grasped for his radio handset and seemingly also his pistol. Despite Garcia's repeated instructions, Burke refused to stop attacking him, and once Burke seized the radio, Garcia reasonably believed Burke might pull him to the ground. Thus, whether one defines Burke's crime as burglary of the Follett Food Market or as initiating a violent confrontation with a peace officer, Garcia knew that Burke was violent and unwilling to obey his orders. Either way, Burke's crime was severe.

The first factor comes closest to favoring Burke. The next two more clearly illustrate why Garcia's use of force was reasonable.

The second *Graham* factor is "whether the suspect poses an immediate threat to the safety of the officers or others." *Deville*, 567 F.3d at 167. Burke was clearly a threat to Deputy Garcia—he started a fight with Garcia and disobeyed Garcia's commands to stand down—but, less directly, Burke also posed a threat to Kendra and John Harvey. Mrs. Harvey was standing just feet from Burke when Burke first attacked Garcia. Although she retreated a few steps once Garcia drew his sidearm, she was at most ten feet away when Garcia fired. Ex. C 07:06. John Harvey remained outside the video's frame, but he was nearby as well.

More importantly, consider the very real threat Burke posed to Deputy Garcia. At the moment Garcia shot him, Burke had his hands on the radio cord attached to Garcia's body and was grappling his way up the cord in an attempt to close the distance between himself and Garcia. It was Burke who dislodged the radio from Garcia's body and grabbed the cord. It was Burke who appeared to reach for Garcia's gun before he was shot, and he certainly reached for it again afterwards. It was Burke who started attacking Garcia within moments of seeing him, and it was Burke who ignored Garcia's repeated pleas with him to stop. Burke also had several objects in the trunk of his off-road vehicle that he could have used as weapons, including a sledgehammer. The pair were nearly within arm's reach of those objects during the entire confrontation.

The totality of the circumstances paints a clear picture: Deputy Garcia responded to the Follett Food Market expecting to render medical aid and found himself in hand-to-hand combat instead. Had he not shot Burke when he did, Burke could have thrown him to the ground by tugging on the radio cord, rendering him defenseless before a violent, potentially armed, and seemingly drug-addled adult male. Or Burke could have destabilized Garcia long enough to grab his firearm.

Burke was violent and unpredictable. Garcia had to think fast. Whether every action he took is beyond reproach is not the question. The question is whether every reasonable officer in Garcia's shoes would instantly recognize what he did as objectively unreasonable. *See Morrow*, 917 F.3d at 876 (noting that only "plainly incompetent" officers should be denied qualified immunity). This Court will not second-guess Garcia's decisions from "the peace of a judge's chambers." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

The third *Graham* factor is the most straightforward. Burke was not just "actively resisting arrest" when Garcia used deadly force—he was fighting Garcia and attempting to use Garcia's radio cord as a way to draw closer to his firearm. *Deville*, 567 F.3d at 167. Garcia gave him multiple chances to stand down. Burke chose not to. And it was Burke himself who initiated the altercation, not Garcia.

All three *Graham* factors favor Deputy Garcia. Thus, he is entitled to qualified immunity at step one—whether he violated Burke's constitutional rights by employing deadly force against him—because his use of force was objectively reasonable under the circumstances.

*C. Plaintiffs' Punitive Damages Claim*

Plaintiffs style their request for punitive damages as an independent cause of action. *See* ECF No. 53 at 8 (seeking standalone "punitive/exemplary damages against Defendant Garcia only" (citation modified)). However, because qualified immunity shields officers from liability for any form of damages, Plaintiffs punitive damages request must be dismissed as well. *See Ramirez v. Killian*, 113 F.4th 415, 421 (5th Cir. 2024) ("Qualified immunity protects government officials from liability for damages when they violate the law, but nonetheless reasonably could have believed that they were acting lawfully."); *Smith v. Wade*, 461 U.S. 30,

33, 55–56 (discussing availability of punitive damages *after* a finding of liability under Section 1983).

## CONCLUSION

Deputy Garcia is entitled to qualified immunity for his actions on August 26, 2024. His Motion is therefore **GRANTED** and all claims against him are **DISMISSED**. Plaintiffs' claim against Lipscomb County remains pending.

**SO ORDERED.**

September 1, 2026

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE